WO                                                                                    JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ace B. Freemon,              ) | No. CV 09-1717-PHX-JAT (JRI) |
|                              ) | |
| Plaintiff,        ) | **ORDER** |
|                              ) | |
| vs.                          ) | |
|                              ) | |
| Charles Ryan, et al.,        ) | |
|                              ) | |
| Defendants       ) | |
|                              ) | |
| _____) | |

Plaintiff Ace B. Freemon filed a civil rights action under 42 U.S.C. § 1983 against multiple Arizona Department of Corrections (ADC) officials (Doc. 6).  Before the Court are Plaintiff's Motion for Finding of Contempt for Defendants' failure to comply with a Court Order (Doc. 105) and Defendants' Motion for Summary Judgment (Doc. 119).

Both motions will be granted in part and denied in part.

**I.     Background**

Plaintiff's claims concern his transfer to and confinement at the ADC Eyman Complex-Browning Unit, a supermax prison facility in Florence, Arizona (Doc. 6 at 1).[1]  He named the following Defendants: (1) Director Charles Ryan; (2) Security Threat Group (STG) Coordinator Lieutenant George Smith; (3) STG Investigator Lisa Celaya; (4) Deputy Warden/STG Committee Member J. Freeland; (5) STG Chair Robert Patton; and STG Committee Members (6) R. Bock and (7) J. Kimble (id.).

---

[1]Plaintiff remains housed in the Browning Unit.

In Count I of his First Amended Complaint, Plaintiff alleged that all Defendants violated his due process rights during the process to validate him as an STG member. He claimed that Defendants failed to provide him sufficient notice of the allegations against him and thereby denied him an opportunity to question witnesses (id. at 4-4(A)). According to Plaintiff, it is Defendants' practice to deny inmates a fair opportunity to question witnesses (id. at 4(B)). Plaintiff further claimed that the evidence used to validate him as an STG member did not satisfy the requisite evidentiary standard (id. at 4(A)). And he averred that there is no meaningful opportunity for review or reclassification and that the renouncement and debriefing options are flawed and unconstitutional and subject inmates to the risk of being labeled a snitch (id. at 4(D)-4(E)). Lastly, Plaintiff alleged that the annual review process is nothing more than a "cursory rubber stamp" of the entire process and that the Step-Down Program effectively does not exist (id. at 4(E)-4(G)).

In Count II, Plaintiff alleged that Ryan and Freeland violated his Eighth Amendment rights when they subjected him to conditions-of-confinement (set forth in Count I) that constituted cruel and unusual punishment, including limited food and outdoor recreation, constant lighting, and deliberate indifference to Plaintiff's medical needs stemming from a serious hand injury (id. at 5-5(B); see id. at 4(C)-4(D)). Plaintiff specifically alleged that due to his hand injury, he had been issued a Special Needs Order (SNO) that required side-cuff restraints instead of behind-the-back restraints (id. at 4(D)). Plaintiff claimed that Ryan and Freeland acted with deliberate indifference when they rescinded this SNO and forced Plaintiff to be cuffed behind his back, which exacerbates his pain (id. at 4(D), 5(B)).

Plaintiff later moved for and was granted preliminary injunctive relief in the form of a Court Order directing Defendants to use side-cuff restraints when cuffing or restraining Plaintiff and to allow Plaintiff to purchase a typewriter (Doc. 64).

In May 2011, seven months after the Court issued the injunction Order, Plaintiff filed his Motion for Finding of Contempt on the ground that Defendants and ADC staff are not using side-cuff restraints as ordered (Doc. 105). On June 15, 2011, Defendants filed their Motion for Summary Judgment on all claims (Doc. 119).

1    Both motions are now fully briefed.  The Court first addresses Plaintiff's motion.

2    **II.    Plaintiff's Motion for Finding of Contempt**

3        **A.    Arguments**

4            **1. Plaintiff's Motion**

5    Plaintiff moves under Federal Rule of Civil Procedure 70 for a finding of contempt

6    and an order to enforce Defendants and ADC officials to comply with the Court's prior Order

7    (Doc. 105).  Plaintiff submits that Defendants and ADC officials have repeatedly violated

8    the Court's October 15, 2010 Order directing them to use side-restraints on Plaintiff during

9    transport or any other time (id. at 1).  He alleges that Defendants failed to require Browning

10   Unit staff to obey the Court's Order (id. at 1-2).  Plaintiff states that he has documented the

11   numerous and continued violations and used the ADC grievance system to complain about

12   this matter, to no avail (id. at 2).  He further states that on April 12, 2011, he sent a letter to

13   defense counsel to notify him of the ongoing violations and requested cooperation to help

14   prevent future violations of the Order (id., Attach. 1).  The letter documented specific

15   instances when ADC officers violated the Order (id.).

16   Plaintiff alleges that ADC officials refuse to obey the Court's Order and, in doing so,

17   they subject Plaintiff to further nerve damage and unnecessary pain and suffering by using

18   behind-the-back restraints (id. at 2).  Plaintiff explains that when he refuses to be cuffed

19   behind the back, he is denied time out of his cell for recreation and showers (id.).

20   Plaintiff recounts that on May 8, 2011, Officer Morgan denied Plaintiff his scheduled

21   recreation and shower—which are scheduled just three times a week—because Morgan

22   refused to use side-cuff restraints, even though Plaintiff produced a copy of the Court Order

23   to Morgan (id. at 2-3).  He states that Morgan confiscated the copy of the Order and informed

24   Plaintiff that he was on report for refusing a direct order to use behind-the-back cuffs (id.

25   at 3).

26   The letter that Plaintiff sent to defense counsel referred to incidents on March 6 and

27   April 12, 2011, when Officers Webster and Wieten refused to use side-cuff restraints and

28   then, because Plaintiff refused behind-the-back cuffing, the officers denied Plaintiff

1    recreation and shower (id., Attach. 1).

2                    **2. Defendants' Response**

3            Defendants acknowledge the Court's October 15, 2010 Order but assert that, as to the

4    three incidents mentioned by Plaintiff, he mischaracterizes the actions of the officers and

5    himself (Doc. 109 at 1-2).

6            Defendants submit a copy of Plaintiff's Individual Inmate Detention Record form for

7    April 12, 2011, to show that Plaintiff was out of his cell from approximately 8:30 am to

8    10:30 am for recreation, and from approximately 10:30 am to 11:00 am for a shower and

9    shave (id., Attach. 1).

10           As to the May 8, 2011 incident, Defendants submit that Plaintiff missed recreation and

11   showers because he refused to comply with dress standards (id. at 2).  They proffer a copy

12   of the May 8, 2011 Information Report by Morgan, which documents that Plaintiff failed to

13   follow orders to remove and give to officers the altered/torn shirt that he was wearing (id.,

14   Attach. 2).

15           Defendants also submit Plaintiff's Individual Inmate Detention Record for March 6,

16   2011, which reflects that Plaintiff refused to attend recreation and showers (id., Attach. 3).

17   Defendants state that they have not been able to determine what happened on that day;

18   however, if he refused recreation due to a lack of side-restraints, it was a mistake (id. at 2-3).

19           Lastly, Defendants proffer the copy of a March 7, 2011 Memorandum directed to

20   Browning Unit Staff; this Memorandum verified that as of that date, Plaintiff was on the list

21   of inmates to be cuffed with side-restraints (id. at 3, Attach. 4).

22                    **3. Plaintiff's Reply**

23           In reply, Plaintiff reiterates that since the Court issued its October 2010 Order, there

24   have been numerous instances where ADC officials refused to use side-restraints, and that

25   the occurrences are not limited to the specific dates he identified in the letter to defense

26   counsel (Doc. 118).  Plaintiff notes that Defendants admit that Plaintiff was not placed on the

27   list for approved side-restraints until five months after the Court issued its order (id. at 2).

28   He submits a copy of defense counsel's response to his April 12, 2011 letter.  Defense

                                        - 4 -

counsel informed Plaintiff that the issue was addressed and resolved on March 7, 2011, by adding Plaintiff to the list of inmates who are approved for modified-restraint orders (id., Attach. 1). Plaintiff further asserts that despite the Court Order that side-restraints must be used on him during transport or any other time, the March 7 Memorandum specifically states that the side-restraint order is valid only for movement within the Browning Unit (id. at 3).

With respect to the specific incidents addressed by Defendants in their response, Plaintiff provides additional details about the exchange with Webster on March 6, 2011, when Webster refused to use side-restraints and denied Plaintiff his recreation and shower (id. at 4). Plaintiff also submits copies of the inmate letter and grievance documents he filed to complain about the March 6 incident (id., Attach. 2).

As to the events on April 12, 2011, Plaintiff reasserts that because Wieten refused to use side-restraints, he denied Plaintiff recreation and showers, and Plaintiff proffers copies of his inmate letter and grievances complaining about the incident (id. at 5, Attach. 3). Plaintiff disputes that he went out for recreation and showers as reflected on the Inmate Detention records for that day (id.). He suggests that the record may show otherwise either because Plaintiff was already scheduled for recreation and showers that day, or the documentation may have been meant for the inmate in the cell next to him but was recorded on the wrong form (id.).

Regarding the May 8, 2011 incident, Plaintiff denies that any exchange took place between him and Morgan about the shirt Plaintiff was wearing (id. at 7). Plaintiff realleges that Morgan refused to use side-cuffs, confiscated Plaintiff's copy of the Court Order, and denied Plaintiff's request to speak to a supervisor (id.). Plaintiff states that he learned later about the report for altered/torn clothing, for which there was no basis (id. at 7-8). Plaintiff submits a copy of the inmate property list authorizing the shirt he wore and the property receipt for the shirt, which was purchased from the ADC inmate store (id. at 8, Attachs. 5-6). Plaintiff also submits the grievance documents for this incident (id., Attach. 7). The May 20, 2011 response to his inmate letter states that Plaintiff's previous grievances on this issue were still pending at the Director's level, but that Plaintiff had been moved with four other

side-restraint inmates to the same pod/tier so that side-restraints will always be available (id.).

Plaintiff describes one other incident that occurred on April 18, 2011, when Officer Belasco was passing out property and delivered an ice chest that Plaintiff had ordered (id. at 6).  Belasco had to cuff Plaintiff before he could receive the chest, but the officer did not have side-cuffs and, since Plaintiff would not cuff up behind the back, Belasco refused to deliver his chest (id.).  Plaintiff did not receive the chest until a week later (id.).  He submits copies of the grievance documents he filed about this incident (id., Attach. 4).  The inmate letter response, dated May 10, 2011, informed Plaintiff that the ADC was developing an alternate storage to the wing so that side-restraints would be more available for officers in Plaintiff's area; however, the details of that plan were not yet finalized or approved (id.).

Finally, Plaintiff asserts that the violations continue to occur and Defendants intentionally disregard the Court's Order (id. at 8-9).  Plaintiff asks that the Court issue a finding of contempt and an Order enforcing the injunction, and he requests that monetary sanctions be imposed against Defendants (id. at 9).

## B.   Analysis

Rule 70 provides that if a judgment requires a party to "perform any . . . specific act and the party fails to comply within the time specified, the court may order the act to be done—at the disobedient party's expense—by another person appointed by the court," or the court may hold the disobedient party in contempt. Fed. R. Civ. P. 70(a) and (e).  Rule 70 is properly employed only after judgment is entered.  See DeBeers Consol. Mines v. United States, 325 U.S. 212, 218 (1945);  Barmat, Inc. v. United States, 159 F.R.D. 578, 582 (N.D. Ga. 1994).  Therefore, to the extent that Plaintiff moves under Rule 70, his motion is denied.

But the Court has inherent power to enforce and require compliance with its own orders.  See Aloe Vera of Am. Inc., v. United States, 376 F.3d 960, 964-965 (9th Cir. 2004).  "All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders . . . .  As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and

1  assess fines." Id. (quotation omitted).  Pursuant to this inherent power, the Court will grant
2  in part Plaintiff's request for enforcement of the prior Order.

3       The communication from defense counsel and the ADC Memorandum submitted by
4  Defendants demonstrate that they did not make an effort to comply with the Court's October
5  15, 2010 Order until March 2011 (Doc. 118, Attach. 1; Doc. 109, Attach. 4).  This delay is
6  extremely troubling, as is Defendants' apparent effort to limit the Order's effectiveness to
7  the Browning Unit when the court made no such limitation.  Further, Plaintiff's evidence
8  supports a finding that even after he was added to the March 7, 2011 Memorandum, he had
9  problems with officers trying to employ behind-the-back cuffing.  The grievance responses
10 show that as late as May 2011, the ADC was still in the process of finalizing plans that would
11 better facilitate the use of side-restraints (see Doc. 118, Attach. 4).

12      At this juncture, the Court will deny Plaintiff's request to impose monetary sanctions;
13 however, Defendants are specifically directed to comply with the Court's October 15, 2010
14 Order.  Further reports of Defendants' failure to comply with the Order will be look upon
15 with disfavor and monetary sanctions will be strongly considered.

16 **III.    Summary Judgment Legal Standard**

17      A court must grant summary judgment "if the movant shows that there is no genuine
18 dispute as to any material fact and the movant is entitled to judgment as a matter of law."
19 Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under
20 summary judgment practice, the movant bears the initial responsibility of presenting the basis
21 for its motion and identifying those portions of the record, together with affidavits, that it
22 believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S.
23 at 323.

24      If the movant meets its initial responsibility, the burden then shifts to the nonmovant
25 to demonstrate the existence of a factual dispute and that the fact in contention is material,
26 i.e., a fact that might affect the outcome of the suit under the governing law, and that the
27 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for
28 the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton

1   Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need

2   not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v.

3   Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific

4   facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v.

5   Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P.

6   56(c)(1).

7       At summary judgment, the judge's function is not to weigh the evidence and

8   determine the truth but to determine whether there is a genuine issue for trial.  Anderson, 477

9   U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

10   inferences in the nonmovant's favor.  Id. at 255.

11   **IV.    Count I-Due Process**

12          **A.    Legal Standard**

13       The Due Process Clause of the Fourteenth Amendment prohibits the states from

14   "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const.

15   amend. XIV, § 1.  To determine whether a procedural due process violation has occurred, a

16   court engages in a two-step analysis.  First, a court looks to whether the person possesses a

17   constitutionally-cognizable liberty interest with which the state has interfered.  Sandin v.

18   Conner, 515 U.S. 472, 485-87 (1995).  Second, if the state has interfered with a liberty

19   interest, a court looks to whether this interference was accompanied by sufficient procedural

20   and evidentiary safeguards.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989).

21       It is well-settled that placement in maximum security segregation units implicates a

22   liberty interest requiring due process protections.  Wilkinson v. Austin, 545 U.S. 209, 224

23   (2005).  An inmate may be deprived of his liberty interest as long as he is accorded the

24   proper procedural protections.  For the initial decision to place an inmate in maximum

25   custody, due process is generally satisfied by notice of the factual basis for the placement and

26   an opportunity to be heard.  Id. at 224-226; Hewitt v. Helms, 459 U.S. 460, 476 (1983),

27   overruled in part on other grounds by Sandin, 515 U.S. 472.  These procedural mechanisms

28   serve to avoid the risk of an erroneous deprivation; "[r]equiring officials to provide a brief

summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason." Wilkinson, 545 U.S. at 226.

After an inmate is placed in maximum security segregation, he is entitled to "some sort" of periodic review of his status. See Hewitt, 459 U.S. at 477 n. 9 ("administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates"). To determine whether the periodic review afforded Plaintiff conforms to due process requirements, the Court must consider "[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Wilkinson, 545 U.S. at 224-25 (citing Matthews v. Eldridge, 424 U.S. 319, 335 (1976)).

## B.   Facts/Arguments

### 1.  Defendants' Factual Assertions

#### b. STG Validation, Renunciation/Debriefing, and Step-Down Program

In support of their summary judgment motion, Defendants submit a separate Statement of Facts (DSOF), which is supported by three declarations from ADC officials and various attachments (Docs. 120, 124)

Defendants' factual assertions relevant to Count I are summarized as follows:

In 1991, the ADC established an STG policy in an effort to control prison gang activity in Arizona's prisons (Doc. 120, DSOF ¶ 1). The ADC has a policy that provides for the identification and certification of prison gangs and the identification and validation of inmate STG members (id. 3-4).

Under this policy, an STG "Suspect" is an inmate believed to be involved in an STG (id. ¶ 25). To be identified as an STG Suspect, there must be documentation of certain

1   specific criteria that is listed on the STG Worksheet; some of the criteria are self-admission,

2   tattoos, court records, association and contacts (id. ¶ 26; Doc. 124, Uehling Decl. ¶ 33).

3          Once an inmate is identified as a Suspect, the Special Security Unit (SSU) staff

4   initiates a "Suspect File," which contains confidential information on the Suspect including

5   the STG Worksheet and an STG Identifying Questionnaire (DSOF ¶ 28).   If there is

6   sufficient evidence in an inmate's Suspect File to meet the validation criteria, the SSU staff

7   prepares an STG Member Validation Packet (id. ¶ 31).

8          An STG Validation Committee, which is made up of three deputy wardens or

9   associate deputy wardens, then conducts an STG Validation Hearing (id. ¶ 36).   The

10   Complex SSU Coordinator notifies the inmate of his Validation Hearing with the Hearing

11   Notification/STG Validation form at least 10 days before the hearing so that the inmate has

12   time to prepare a defense (id. ¶ 38).   The inmate signs and dates the Hearing Notification

13   form to acknowledge that he received it (id.).   The inmate chooses whether to appear at the

14   hearing or waive his right to appear and whether he will request witnesses; witnesses are

15   requested using the STG Witness Request/Response form (id.).   The inmate's choices are

16   denoted on the Hearing Notification form by checking boxes or initialing next to each choice

17   (id.).   If the inmate requests witnesses, the Complex SSU Coordinator provides the inmate

18   the forms and, no later than five business days before the hearing, picks up the completed

19   forms from the inmate (id.).

20          Once an inmate has been validated as a STG member through the STG validation

21   process, the inmate may appeal the validation decision, choose to renounce his STG

22   membership through the debriefing process, or accept his validation and not renounce his

23   STG membership (id. ¶ 42).   An inmate who refuses to renounce and debrief receives an

24   annual review by Classification staff (id. ¶ 45).   The review consists of an inquiry as to

25   (a) whether the inmate is still associated with an STG or (b) whether the inmate has

26   disassociated himself from the STG, renounced his gang affiliation, and is sincerely willing

27   and able to debrief (id.).   A validated inmate is considered an ongoing threat to prison

28   security and, therefore, is segregated and assigned to be housed at the maximum-security

Browning Unit until the inmate is released from prison, renounces his STG membership and satisfactorily debriefs, or successfully completes the ADC Step-Down Program (SDP) (id. ¶ 47).

Renunciation is when a validated STG member renounces his STG affiliation (id. ¶ 49). This is followed by the debriefing process, in which an STG Unit staff member uses a STG Questionnaire to document the claim that an inmate is no longer a member of an STG (id. ¶ 50). The objectives of the debriefing process are to (1) learn enough about the validated STG member and the STG to determine whether the inmate has withdrawn from the STG, (2) provide information regarding the STG's structure and activity that would adversely impact the STG and assist in management of the STG population, and (3) provide sufficient information to determine if the inmate requires protection from other STG members or suspects (id. ¶ 51). A validated STG member who renounces membership and satisfactorily debriefs is immediately housed in Protective Segregation (PS) and is then reviewed for permanent PS status (id. ¶ 54)

A validated STG member can request to renounce and debrief at any time (id. ¶ 58). There is no waiting period to request to debrief, unless the inmate previously requested to debrief and failed to satisfactorily do so, in which case the inmate is not eligible to debrief again for a period of six months (id.).

As an alternative to the debriefing process, a validated STG member may be able to leave the Browning Unit through the Step-Down Program, which provides an inmate the opportunity to demonstrate that he is not involved in STG activity (id. ¶ 61). The Step-Down Program began in March 2006 and was substantially revised in November 2009 (id. ¶¶ 61-62).

Under the 2006 Step-Down Program, an inmate was not eligible to participate until he served 48 months in the Browning Unit as a validated STG member (id. ¶ 65). To make a request to participate in the Step-Down Program, the inmate must have completed a continuous 24-month period where he did not participate in any documented gang activity or have any documented incidents of assaultive behavior, extortion, or threats toward staff

1    or other inmates (id. ¶ 65).  The next requirements were successful completion of a polygraph

2    examination and a comprehensive investigation by the STG Unit (id.).  The inmate must have

3    been recommended for participation in the Step-Down Program by the Institutional Re-

4    Classification staff, the unit Deputy Warden, or the STG Unit staff (id.).  Once an inmate met

5    these requirements, he could be evaluated for eligibility to enter the Step-Down Program at

6    his next annual review (id. ¶ 67).  The Step-Down Program had to be completed within 18

7    months after entry into the program (id. ¶ 76).  During this time, the inmate was required to

8    avoid any STG activity or disciplinary behavior, to complete certain rehabilitation programs,

9    and to participate in counseling and group activities (id.).

10        The ADC revamped the Step-Down Program in 2009 (id. ¶ 79).  Under the current

11   Step-Down Program policy, to participate, an inmate must have completed a continuous 24-

12   month period absent any STG activity and make a written request to ADC staff (id. ¶ 81).

13   There is no longer a 48-month waiting period for an inmate's initial evaluation of eligibility

14   (see id.).  The Step-Down Program must still be completed within 18 months of the date of

15   entry into the program (id. ¶ 86).  The Step-Down Program is divided into three 180-day

16   phases and provides inmates progressively more freedom in three increments (id. ¶ 88).

17                        **b.  Plaintiff's Validation**

18        With respect to Plaintiff's validation, Plaintiff was served with the Hearing

19   Notification/STG Validation form, i.e., the Hearing Notice, on March 12, 2008 (id. ¶ 97).

20   This Notice informed Plaintiff that he was suspected of being an STG member of the Aryan

21   Brotherhood, and it explained the basis for that suspicion (id. ¶ 98).  The Hearing Notice

22   advised Plaintiff that his Validation Hearing was scheduled for March 27, 2008, at 9:00 a.m.

23   (id.).  On the Hearing Notice form, Plaintiff checked the boxes indicating that he would

24   appear at the hearing and that he requested witnesses (id. ¶ 99).

25        The hearing was postponed until May 23, 2008, because Plaintiff was out of prison

26   for court appearances from March 24, 2008-April 18, 2008 (id. ¶ 100).

27        Plaintiff submitted written questions to three witnesses, and the witnesses responded

28   in writing to the questions (id. ¶ 102).

The hearing was held on May 23, 2008 (id. ¶ 103).  Plaintiff submitted the written witness questions and answers, which the Committee reviewed along with all other evidence (id. ¶¶ 103, 105).  The Committee recommended that Plaintiff be validated as an STG member, and Plaintiff opted to appeal that decision (id. ¶¶ 106-107).  In his appeal, Plaintiff did not claim that the Hearing Notice was inadequate or that he was denied the ability to prepare for the hearing (id. ¶ 108).  The STG Appeals Committee found that the evidence sufficiently supported the findings of the Committee, and the STG validation was upheld (id. ¶ 109).

To date, Plaintiff has not made a request to renounce or to debrief, nor has he made a request to participate in the Step-Down Program (id. ¶¶ 110-111).

### 2. Defendants' Legal Arguments

In their motion, Defendants acknowledge that Plaintiff possessed a liberty interest in avoiding transfer to the Browning Unit and, therefore, was entitled to sufficient procedural and evidentiary standards (Doc. 119 at 5).  They submit that due process requires notice but that it does not require detailed written notice (id. at 6).  According to Defendants, Plaintiff received written notice that set out in great detail the evidence that would be used to validate him as an STG member (id.).  Defendants also state that, although there is no constitutional requirement that inmates be provided an opportunity to present witnesses at an administrative segregation hearing, here, Plaintiff was given that opportunity and submitted written answers from witnesses that he chose (id.).

Defendants next argue that because the validation hearing is an administrative process—not disciplinary—due process only requires a "some evidence" standard and, here, there was more than "some evidence" to support the finding that Plaintiff is a STG member (id. at 6-8).  Defendants note that other courts in this district have reviewed the same validation process—in particular, the notice and hearing components—and concluded that it comports with due process (id. at 8, citing Baptisto v. Ryan, CV 03-1393-PHX-SRB, and Hampton v. Ryan, 2008 WL 2959604, at *1 (9th Cir. Aug. 4, 2008)).

Similarly, Defendants contend that the annual review of Plaintiff's STG status

satisfies due process (id. at 8-9).  They reiterate that Plaintiff may renounce and debrief at any time or he may request to enter the Step-Down Program at any time (id. at 9-10).  Defendants assert that Plaintiff receives classification hearings yearly; however, he may leave the Browning Unit only if he terminates his STG-membership (id. at 10).  Defendants explain that courts have approved annual reviews for inmates in supermax facilities (id. at 12).  And Defendants contend that when the sole reason for an inmate's supermax placement is STG membership, like Plaintiff, annual reviews are adequate given that terminating membership is the only avenue out of Browning (id. at 13).

Defendants maintain that there is no constitutional requirement for alternate paths to leave administrative segregation, such as the Step-Down Program, which they assert is currently available (id.).  They argue that due process is satisfied with debriefing and renouncing as the sole way to exit the Browning Unit because this process satisfies the factors set forth in Matthews (id.).

As to Plaintiff's claim that he would be labeled a snitch if he debriefed, Defendants contend that such a claim is mere speculation, and, nonetheless, the ADC has taken steps to maximize the safety of debriefed inmates by placing them in protective segregation (id. at 16-17).  Further, Defendants note that Plaintiff has not debriefed or entered the Step-Down Program, so he faces no threat to his safety (id. at 17).  Defendants also argue that Plaintiff's claim that he cannot debrief because he is not a gang member constitutes a backdoor attack on the validation process, which already found sufficient evidence to validate Plaintiff as an STG member (id. at 18).

Defendants conclude by arguing that the procedures set up to validate STG members are constitutional, and Defendants simply implemented those procedures when applying the validation process to Plaintiff (id.).  They state that there is no evidence that any particular Defendant violated Plaintiff's rights in their individual roles in the validation process (id. at 18-19).

For the above reasons, Defendants request summary judgment on Count I.

### 3.  Plaintiff's Response

1    In response, Plaintiff states that he is unable to respond to Defendants' arguments on

2    the due-process claim in Count I due to the events surrounding the transfer of the inmate who

3    had been assisting him with writing/litigating this action (Doc. 125 at 2).  In his attached

4    declaration, Plaintiff avers that on June 14, 2011, that inmate, William Isbell, was transferred

5    to protective segregation along with all of Plaintiff's legal paperwork and documentation,

6    case law, and self-help books (id., Attach. 1, Pl. Decl. ¶ 1).  Plaintiff states that a couple days

7    later, ADC staff informed him that Isbell had given staff a large amount of "legal stuff,"

8    which was sent to Phoenix to be reviewed by ADC legal staff (id.).  Plaintiff avers that on

9    June 29, 2011, he received a large stack of papers pertaining to this action; however, the

10   papers were in complete disarray and the case law and self-help books were not returned with

11   the papers (id.).  For this reason, he states that no response can be provided to Defendants'

12   arguments regarding notice, the annual reviews, the Step-Down Program, or debriefing (Doc.

13   125 at 2).

14              **4.  Defendants' Reply**

15   Defendants note that Plaintiff moved to extend the time in which to file his response

16   due to the lack of access to materials following Isbell's transfer, and on July 5, 2011, the

17   Court granted Plaintiff's request and extended the response deadline to August 2, 2011 (Doc.

18   128, citing Doc. 123).  Defendants state that Plaintiff nonetheless signed and filed his

19   response on July 12, 2011 (Doc. 128, citing Doc. 125).  They submit that because Plaintiff

20   received his paperwork back on June 29, 2011, he had more than enough time and

21   opportunity to respond to their motion (Doc. 128 at 1-2).  Defendants also note that the Court

22   allowed him to use a typewriter when it granted his preliminary injunction request; however,

23   he has chosen not to use a typewriter (id. at 2).

24              As to their argument for summary judgment on Count I, Defendants reassert that the

25   identical claims about STG validation have been asserted and rejected repeatedly in this

26   District (id., citing Hernandez v. Schriro, CV 05-2853-PHX-DGC (JJM) (Doc. 195); and

27   Thomas v. Ryan, CV 09-1777-PHX-PGR (LOA) (Doc. 71)).  Defendants further argue that

28   Plaintiff makes no substantive argument supporting his claim in Count I; thus, summary

1   judgment should be granted (id. at 3).

2       **C.    Analysis**

3           **1. Plaintiff's Asserted Inability to Respond**

4         At the outset, the Court addresses Plaintiff's claim that he was unable to adequately

5   respond to Defendants' Count I arguments because he was denied access to his legal

6   materials and, when they were finally returned to him, they were jumbled together and some

7   law books were missing (Doc. 125, Attach. 1, Pl. Decl. at 1-2).

8         With their motion, Defendants submit a 50-page DSOF that is supported by 205 pages

9   of exhibits (Doc. 120, Exs. A-C).  Arguably, that number of pages jumbled and out-of-order,

10  combined with other legal papers Plaintiff may have had, would be a burden to organize.

11  But, as Defendants point out, although Plaintiff was given additional time to prepare his

12  response, he chose not to use that time and instead submitted his response memorandum

13  weeks before the filing deadline (see Doc. 125).  Plaintiff presents no explanation for filing

14  his response early and not using available time to try to organize his papers and address

15  Defendants' arguments. Notably, Plaintiff was able to respond directly to Defendants' Count

16  II arguments about the side-restraint policy and qualified immunity, and he even quotes from

17  Defendants' motion (Doc. 125 at 3-4).

18        On summary judgment, the Court must determine whether there is a genuine issue as

19  to any material *fact*; if there exist disputed *material facts*, summary judgment is not

20  warranted.  See Fed. R. Civ. P. 56(a).  The summary judgment analysis therefore turns on

21  Plaintiff's factual assertions and the evidentiary support for those assertions, not on his

22  ability to argue legal theories.  See Fed. R. Civ. P. 56(c).  As such, lack of access to law

23  books or self-help legal books does not prevent Plaintiff from responding to the factual

24  assertions in Defendants' summary judgment motion.

25        The Court finds that Plaintiff had sufficient opportunity to respond to Defendants'

26  motion and present facts to dispute Defendants' assertions.  To the extent that he did not do

27  that, the Court will construe Plaintiff's verified First Amended Complaint as an affidavit in

28  response to the summary judgment motion.  See Moran v. Selig, 447 F.3d 748, 760 n. 16 (9th

Cir. 2006) ("a verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and if it sets forth the requisite facts with specificity").

### 2. Notice and Opportunity to Question Witnesses

Plaintiff alleges that the Hearing Notice was deficient because it contained a vague description of the charges against him (Doc. 6 at 4(A)).  With their motion, Defendants submit a copy of the Hearing Notice, which clearly states that Plaintiff is accused of being a member of an STG and identifies the specific evidence that supports that accusation (Doc. 124, Ex. B, Attach. 4).  The Notice then describes five incidents that provide evidence supporting the suspicion that Plaintiff is an STG member: (1) in 2002, SSU staff intercepted a letter and a poem authored by Plaintiff that he tried to send to an Aryan Brotherhood Suspect and that reflected Plaintiff's loyalty to the group; (2) a 2008 property search of Plaintiff's cell uncovered two letters, one authored by a validated Aryan Brotherhood member and the other authored by a suspected member; (3) in a 2006 search of another inmate's property, SSU staff found cards containing inmate names and numbers of validated and suspected members of the Aryan Brotherhood, including Plaintiff's name and inmate number; (4) in 2006, SSU staff seized two inmate letters that were addressed to Plaintiff and that discussed Aryan Brotherhood activity and business; and (5) in 2007, SSU staff discovered a membership list for the Aryan Brotherhood in another inmate's property box, and Plaintiff's name was on the list (id.).  The description of each incident includes the exact dates and names of all inmates involved (id.).  The face of the hearing Notice reflects that Plaintiff received and signed this Hearing Notice on March 12, 2008 (id.).

The Court finds that this Hearing Notice more than adequately set forth a "brief summary of the factual basis" for suspecting Plaintiff of STG membership, and there was sufficient information, including specific dates and named inmates who were connected to various incidents, for Plaintiff to prepare a rebuttal to the charges.  See Wilkinson, 545 U.S. at 226.

Defendants' evidence further shows that Plaintiff was provided the opportunity to

1   question witnesses of his choice through written questions and to submit those witness

2   answers at his Validation Hearing (Doc. 124, Freeland Decl. ¶¶ 11, 14-15).  In failing to

3   respond, Plaintiff does not demonstrate how—in light of this evidence—he was prevented

4   from questioning witnesses or adequately responding to the specific charges against him.

5       On the record before the Court, the Hearing Notice and procedures for questioning

6   witnesses that were provided to Plaintiff satisfy due process.

7                          **3.  Validation Hearing**

8       Plaintiff alleges that the ADC STG policy requires that there be "clear and

9   compelling" evidence to certify a group as an STG; however, in his hearing, Defendants used

10  very "suspect criteria" that was subjective in nature and that did not even satisfy the "some

11  evidence" standard (Doc. 6 at 4(A)).

12      Defendants submit a copy of the STG policy, Department Order (DO) 806 (Doc. 124,

13  Ex. A, Attach. 1).  The "clear and compelling" standard that Plaintiff refers to is the standard

14  for determining whether a group may be certified as an STG; it does not relate to individual

15  inmate validations (id., DO 806.01 §§ 1.2, 1.2.2).

16      Inmate gang validations are subject to the "some evidence" standard.  Bruce v. Ylst,

17  351 F.3d 1283, 1287-88 (9th Cir. 2003).  This standard sets a low bar, consistent with the

18  recognition that assignment of inmates within prisons is "essentially a matter of

19  administrative discretion," subject to "minimal legal limitations."  Id. at 1287 (citing

20  Toussaint v. McCarthy, 801 F.2d 1080 (9th Cir. 1986)).  A single piece of evidence may be

21  sufficient to meet the "some evidence" requirement, if that evidence has "sufficient indicia

22  of reliability."  Bruce, 351 F.3d at 1288.  Courts are not required to "examine the entire

23  record, independently assess witness credibility, or reweigh the evidence; rather, 'the relevant

24  question is whether there is any evidence in the record that could support the conclusion.'"

25  Id. at 1287 (citing Superintendent, Mass. Corr. Inst. v. Hill, 472 U S. 445, 455-56 (1985)).

26      In his First Amended Complaint, Plaintiff addresses the evidence used against him and

27  asserts that he did not author the membership lists that included his name, nor were those lists

28  found in his possession (Doc. 6 at 4(A)).  He also claims that what Defendants refer to as

1   "gang business" in a letter was nothing more than well wishes to another inmate (id. at 4(B)).

2   The Court will not reweigh this evidence or make a determination on Plaintiff's credibility.

3   Defendants' evidence demonstrates that they relied on two forms of written correspondence

4   showing Plaintiff's loyalty to the Aryan Brotherhood (see Doc. 124, Ex. B, Attach. 6).  The

5   Court finds that this was sufficient evidence to validate Plaintiff as an STG member; thus,

6   the validation hearing and evidentiary standard applied met due process requirements.

7                      **4.  Avenues to Exit Administrative Segregation**

8                          **a.  Annual Reviews**

9          According to Plaintiff, the annual review process constitutes a very limited review and

10  is little more than a "rubber stamp" of the validation process (Doc. 6 at 4(E)).  Defendants

11  maintain that the annual reviews are sufficient for inmates housed in supermax due to their

12  STG status, as opposed to inmates housed in supermax for other reasons, in which case more

13  frequent reviews are required (Doc. 119 at 10-13).

14         To the extent Defendants argue that annual reviews alone are sufficient to satisfy due

15  process, their argument fails.  In Hernandez v. Schriro, the Ninth Circuit reversed the district

16  court's finding that annual reviews did not violate due process and specifically stated that

17  annual reviews alone are insufficient.  357 F. App'x 747, 749 (9th Cir. 2009) (citing

18  Toussaint, 801 F.2d at 1101).

19         But Defendants' evidence reflects that in addition to annual reviews, Plaintiff can

20  renounce and debrief at any time (Doc. 124, Ex. A, Uehling Decl. ¶ 65).  On remand in

21  Hernandez, this Court found that annual reviews, combined with the option to debrief at any

22  time, satisfied due process.  2011 WL 2910710, at *8 (D. Ariz. 2011).  The Court observed

23  that no prior case had held that debriefing as the sole method of leaving administrative

24  segregation violates due process.  Id., at *9 (citing Terflinger v. Rowland, 76 F.3d 388, at *2

25  (9th Cir. 1996)).  And the plaintiff in Hernandez, just like Plaintiff in this case, had not

26  requested to debrief, nor had the STG of which he was a member been decertified by ADC.

27  See Hernandez, 2011 WL 2910710, at *9.  Consequently, there was no evidence of a risk

28  of erroneous result in his annual review process.  See id.; Matthews, 424 U.S. at 335.

1    The <u>Hernandez</u> Court balanced the three <u>Matthews</u> factors and determined that the
2    plaintiff could not show that the process afforded him, i.e., the annual reviews with
3    debriefing available, was inadequate.  2011 WL 2910710, at *8-9.  "Because debriefing is
4    available at any time, the periodic review of [the plaintiff's] status satisfies the <u>Matthews</u>
5    test . . . ."  <u>Id.</u>, at *9.  Plaintiff presents nothing that causes this Court to find differently in
6    the instant action.

7                              **b.  Debriefing**

8    Plaintiff contends that debriefing creates a serious risk to an inmate's safety because
9    he is then identified as a snitch.  The Eighth Amendment requires prison officials to protect
10   prisoners from violence at the hands of other prisoners.  <u>Farmer v. Brennan</u>, 511 U.S. 825,
11   833 (1994).  To establish an Eighth Amendment violation, a prisoner must first satisfy an
12   objective requirement—he must show that he has been transferred into "conditions
13   posing a substantial risk of serious harm."  <u>Id.</u> at 834.  Then, he must satisfy a subjective
14   requirement—he must show that the defendant was aware of the risk and disregarded it.  <u>Id.</u>
15   at 834, 837.  Courts have recognized that being labeled a snitch can place an inmate at a risk
16   of harm.  <u>See</u> <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1138-39 (9th Cir. 1989); <u>see also</u>
17   <u>Wilkinson</u>, 545 U.S. at 227 ("[t]estifying against, or otherwise informing on, gang activities
18   can invite one's own death sentence").  But it is unclear whether this same risk is present
19   when an inmate is placed in PS as opposed to the general population.  <u>See</u> <u>Hernandez</u>, 2011
20   WL 2910710, at *5 (distinguishing the risk of harm faced by inmates who are labeled as
21   snitches and placed in general population with debriefed inmates who are labeled as snitches
22   and placed in PS).

23   Regardless, even assuming that the objective prong of the deliberate indifference
24   analysis is met when an inmate debriefs and is identified as a snitch, <u>see</u> <u>Farmer</u>, 511 U.S.
25   at 833, Plaintiff has not satisfied the subjective prong.  Defendants undisputed evidence
26   shows that they did not disregard this risk to inmates' safety.  The evidence shows that a
27   debriefed STG member is not housed with other inmates but is placed in PS (Doc. 124, Ex.
28   A, Uehling Decl. ¶ 61).  Plaintiff presents no argument to suggest that PS placement does not

provide reasonable safety to debriefed inmates following their transfer out of the Browning Unit.  See Farmer, 511 U.S. at 844 (finding that a prison official who responds reasonably to a risk is not liable—even if the harm ultimately is not averted).  Further, because the record shows that Plaintiff has not debriefed, he cannot show that he has faced or will face a substantial risk of serious harm in PS.  See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987) (the "mere threat" of future bodily harm to a prisoner may not provide a basis for a cognizable Eighth Amendment claim).  In short, Plaintiff cannot demonstrate that debriefing is not an adequate alternative to annual reviews.

### c. Step-Down Program

Finally, Plaintiff alleges that the Step-Down Program is not a viable alternative for leaving administrative segregation because it does not guarantee that an inmate will be released from the Browning Unit even if the inmate completes every step (Doc. 6 at 4(F)). He further alleges that after the program was stopped in 2006, it never restarted and does not exist today (id. at 4(G)).

An STG-validated prisoner is not entitled to an alternative means to exit administrative segregation if annual reviews and debriefing are available and satisfy due process, which is the case here.  See Hernandez, 2011 WL 2910710, at *7.  Further, Defendants demonstrate that the Step-Down Program was restarted in 2009, and that Plaintiff can request to participate in the program but, to date, he has not done so (Doc. 124, Ex. A, Uehling Decl. ¶¶ 86-88; Ex. B, Freeland Decl. ¶ 20).

In light of the above, Defendants are entitled to summary judgment on Plaintiff's due process claim in Count I.

## V.   Count II-Conditions of Confinement

Plaintiff's allegations in Count II concern conditions of confinement.  One of the "conditions" he complains of is medical care and the lack of accommodation for his hand injury (see Doc. 6 at 4(D), 5(B)).  The Court will address the general conditions-of-confinement allegations first and then turn to the allegations specific to his hand injury.

Plaintiff alleges that the following conditions of his confinement violate the Eighth

1  Amendment: (1) isolation; (2) cell illumination; (4) limited recreation; (5) denial of adequate

2  food; (6) restricted privileges; and (7) hygiene/sanitation (Doc. 6 at 4(B)-(C), 5).

3      **A.    Legal Standard**

4      "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

5  punishment forbidden by the Eighth Amendment." Whitley v. Albers, 475 U.S. 312, 319

6  (1986).   "Among 'unnecessary and wanton' inflictions of pain are those that are totally

7  without penological justification." Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (citation

8  omitted).  To demonstrate that a prison official has deprived an inmate of humane conditions

9  in violation of the Eighth Amendment, two requirements must be met—one objective and

10  one subjective. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000).  First, "the prison

11  official's acts or omissions must deprive an inmate of the minimal civilized measure of life's

12  necessities."  Id. (internal citation omitted).  The subjective prong requires the inmate to

13  demonstrate that the deprivation was a product of "deliberate indifference" by prison

14  officials. Wilson v. Seiter, 501 U.S. 294, 303 (1991).  As mentioned above with regard to

15  prison officials' obligation under the Eighth Amendment to protect prisoners from other

16  prisoners, deliberate indifference occurs only if a prison official "knows of and disregards

17  an excessive risk to inmate health or safety; the official must both be aware of facts from

18  which the inference could be drawn that a substantial risk of serious harm exits, and he must

19  also draw the inference." Farmer, 511 U.S. at 837.

20      **B.    Isolation**

21      The Ninth Circuit has found that "administrative segregation, even in a single cell for

22  twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a

23  sentence."   Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing

24  Toussaint, 801 F.2d at 1091-92).  Even so, the Ninth Circuit has also recognized that the

25  harsh conditions such as those in the Browning Unit can cause psychological harm.  See

26  Miller v. Stewart, 231 F.3d 1248, 1252 (9th Cir. 2000) (in a death row case, experts stated

27  that conditions present in [supermax placement] can cause psychological decompensation

28  to the point of incompetency).  Other courts, however, have found that standing alone, the

isolation inherent in segregation does not violate the Eighth Amendment.  In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 472 (4th Cir. 1999) ("the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable"); Jackson v. Meachum, 699 F.2d 578, 581-83 (1st Cir. 1983) (no Eighth Amendment violation by confining inmate in indefinite segregation that was otherwise satisfactory except for virtually no communication or association with other inmates, even when conditions caused depression).

While it is clear that something more than isolation is required to violate the Eighth Amendment, it is not exactly clear what the standard is.  But the Court need not reach that question because the evidence does not show that Plaintiff is incarcerated in complete isolation.

Plaintiff alleges that the only socialization available is brief telephone calls and limited visitation through protective glass (Doc. 6 at 4(B)).[2]

In contrast, Defendants' evidence shows that inmates can communicate with other inmates in their cell group, though not face-to-face (Doc. 120, DSOF ¶ 120).  And, as Plaintiff acknowledges, there is visitation at the Browning Unit.  Inmates are permitted a weekly two-hour block of non-contact visitation with up to four visitors at a time (id. ¶ 121). STG-validated inmates are allowed one telephone call per week (id. ¶ 122).  See Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996) (prisoner telephone access is subject to reasonable security limitations) (citation omitted).  In addition, inmates housed at the Browning Unit may possess soft cover books and cassette players and head phones (DSOF ¶ 123).

The undisputed evidence shows that Plaintiff has opportunities for limited social contact and, therefore, is not isolated to a degree that would violate the Eighth Amendment. Moreover, as discussed above, at any time Plaintiff may initiate the debriefing process, which

---

[2]Plaintiff states that he was unable to respond to Defendants' specific arguments regarding isolation/social interaction, lighting, recreation, diet, and privileges because his legal paperwork was returned to him in disarray (Doc. 125 at 1-2).  For the reasons set forth above as to Count I, the Court finds that Plaintiff had a sufficient opportunity to respond to Defendants' asserted facts and arguments.

1   may allow him to transfer out of the Browning unit and its limits on social contact.
2   Defendants will be granted summary judgment on the isolation claim.

3   **C.   Cell Illumination**

4        The Eighth Amendment requires that inmates be given appropriate lighting.  <u>Keenan</u>,
5   83 F.3d at 1090.  Constant illumination of a prison cell, standing alone, has been upheld as
6   constitutional under certain circumstances.  <u>See, e.g.</u>, <u>Warren v. Kolender</u>, 2009 WL 196114,
7   at *15 (S.D. Cal., Jan. 22, 2009).  But 24-hour lighting with excessively bright bulbs has
8   been held to violate the Eighth Amendment.  <u>See</u> <u>Keenan</u>, 83 F.3d at 1090–91.  Thus, the
9   inquiry into whether constant security lighting in prison cells violates the Eighth Amendment
10  is necessarily fact-specific and often depends upon the brightness of the light at issue.  For
11  example, 24-hour lighting with single 9-watt or 13-watt bulbs has been found not to be
12  objectively unconstitutional.  <u>Vasquez v. Frank</u>, 290 F. App'x 927, 929 (7th Cir. Aug.15,
13  2008) (24-hour lighting with one 9-watt fluorescent bulb not an "extreme deprivation");
14  <u>McBride v. Frank</u>, 2009 WL 2591618, at *5 (E.D. Wis. Aug.21, 2009) (24-hour lighting with
15  a 9-watt fluorescent bulb not unconstitutional); <u>Wills v. Terhune</u>, 404 F. Supp. 2d 1226,
16  1230–31 (E.D. Cal. 2005) (24-hour illumination by 13-watt bulb not objectively
17  unconstitutional); <u>compare with</u> <u>Keenan</u>, 83 F.3d at 1090-91 (24-hour lighting from "large
18  fluorescent lights" unconstitutional where prisoner could not tell if it was night or day).

19       Plaintiff alleges that the lights cannot be turned off day or night and that he
20  consequently suffers headaches and loss of sleep (Doc. 6 at 4(C)-(D)).

21       Defendants explain that each cell contains four light bulbs: one 40-watt fluorescent
22  lamp "up light"; two 40-watt fluorescent lamps "down light"; and one 7-watt fluorescent
23  night light (Doc. 120, DSOF ¶ 112).  During the day, all four bulbs remain on and, at night,
24  only the 7-watt night light remains on (<u>id.</u>).  Defendants submit that the 7-watt security light
25  enables staff to conduct health and welfare/security checks during the night and ensures the
26  safety of the officers (<u>id.</u>, Ex. C, Reyna Decl. ¶ 9).

27        In light of Plaintiff's failure to respond to Defendants' evidence that there is a single
28  dimmed light at night and that this light is for security purposes, the Court finds the

- 24 -

1   Defendants are entitled to summary judgment on this claim.

2          **D.     Recreation**

3          Exercise is a basic human necessity protected by the Eighth Amendment; thus, the

4   deprivation of outdoor exercise for inmates who are under long-term segregation violates the

5   Constitution. Keenan, 83 F.3d at 1089. But restricting an prisoner's exercise privileges may

6   be reasonable if the prisoner represents a serious security risk. LeMaire v. Maass, 12 F.3d

7   1444, 1458 (9th Cir. 1993). Five hours of exercise per week has been found to be

8   constitutionally sufficient. See Baptisto v. Ryan, 2006 WL 798879, at *33 (D. Ariz. March

9   28, 2006) (collecting decisions of the Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth

10  Circuits).

11         According to Plaintiff, STG inmates are never allowed outside, and the "recreation

12  area" is simply a 10x20 walled, concrete box with a steel grated, mesh top (Doc. 6 at 4(C)).

13  He alleges that except for one racquetball, no exercise equipment is provided, and his only

14  contact with the sun is an occasional glimpse through a skylight (id.).

15         Defendants proffer evidence that inmates housed in the Browning Unit receive six

16  hours of out-of-cell recreation per week and the six hours is on three different days and two

17  hours in duration (Doc. 120, DSOF ¶ 125). The recreation area has a cement floor and walls

18  and a steel mesh top that allows fresh air and sunlight into the area (id. ¶ 126). Inmates may

19  use a handball during recreation sessions, but no other equipment is allowed (id.).

20         Plaintiff does not dispute that he receives six hours of exercise per week, which is

21  more than required. Further, the evidence shows that he gets natural light and fresh air.

22  Plaintiff submits no evidence showing specific injury as a result of the limits on his exercise

23  (see Doc. 6 at 4, 4(I)). On this record, Defendants are entitled to summary judgment on

24  Plaintiff's exercise claim.

25         **E.     Food**

26         "The Eighth Amendment requires only that prisoners receive food that is adequate to

27  maintain health; it need not be tasty or aesthetically pleasing." LeMaire, 12 F.3d at 1456.

28  "The fact that the food occasionally contains foreign objects or sometimes is served cold,

while unpleasant, does not amount to a constitutional deprivation." Id. (internal citations omitted). But if an inmate is served meals with insufficient calories for long periods of time, he may be able to demonstrate a violation of his right against cruel and unusual punishment. Id.

Plaintiff alleges that he is served a restricted, low-calorie diet, and because he is not allowed to work, he is unable to purchase food items from the canteen (Doc. 6 at 4(C)).

Defendants confirm that inmates at the Browning Unit received a reduced-calorie diet due to their sedentary lifestyle (Doc. 120, DSOF ¶ 127). According to Carlos Reyna, an ADC Lieutenant and the Special Services Unit Coordinator, a nutritionist designed the diet to ensure that these low-level activity inmates receive proper calories and nutrition (id., Ex. C, Reyna Decl. ¶ 22). Reyna further explains that STG-validated inmates receive three-meals-per-day during the week and two-meals-per day on the weekends, with one hot meal each day (id. ¶ 25).

Plaintiff presents no specific facts or evidence to dispute Defendants' evidence that the calories provided to him are determined by a nutritionist to meet his health needs, nor does he present any evidence that he has been injured or is underweight as a result of the diet he receives. Accordingly, summary judgment is appropriate on Plaintiff's diet claim.

**F.    Privileges**

Plaintiff's allegation that he is denied access to rehabilitation opportunities, classes, and vocational programs fails to implicate the Eighth Amendment (see Doc. 6 at 4(C)). There is no constitutional right to rehabilitation, and the lack of educational or vocational programs does not rise to a constitutional violation. Hoptowit, 682 F.2d at 1254-55. Even so, Plaintiff does not dispute that he is allowed to have limited drawing materials and he may be eligible to participate in limited in-cell education programs (DSOF ¶¶ 132-133).

**G.    Hygiene**

A complete denial of personal hygiene items violates the Eighth Amendment. See Keenan, 83 F.3d at 1089-91. And subjecting an inmate to lack of sanitation that is severe or prolonged can rise also to a constitutional deprivation. Anderson, 45 F.3d at 1314; see Hutto

v. Finney, 437 U.S. 678, 686-87 (1978).  Therefore, prison officials must provide inmates with adequate sanitation.  See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).  If a prison official's refusal to provide adequate cleaning supplies prohibits inmates from maintaining minimally sanitary cells and thereby threatens their health, it amounts to a constitutional violation.  See Hoptowit v. Spellman, 753 F.2d 779, 784 (9th Cir. 1985).

Plaintiff states that he receives just three eight minute showers a week and he is denied access to mops, brooms, and cleaning solutions (Doc. 6 at 4(C)).

Defendants do not address Plaintiff's allegations regarding hygiene and cleaning supplies, except for asserting that Plaintiff is allowed to purchase hygiene items from the commissary (Doc. 120, DSOF ¶ 124).

Plaintiff's concession that he is allowed three showers a week along with evidence that he may purchase hygiene items shows that he is not denied the right to personal hygiene.  Although Plaintiff alleges that he is denied mops and cleaning solutions for his cell, he does not indicate what cleaning items he is provided or whether he is completely unable to maintain sanitation in his cell, nor does he allege any injury in connection with his hygiene/cleaning-supplies claim.  Defendants will therefore be granted summary judgment on this claim.

Because summary judgment will be granted on the due process claim and the above conditions-of-confinement claims, the Court need not address Defendants' argument for qualified immunity (see Doc. 119 at 23).

## G.    Medical Care

The Court now turns to Plaintiff's allegations concerning medical care for his hands.  Plaintiff alleges that due to extensive wounds he suffered to both hands, and after he was diagnosed with severe nerve damage, he was issued a SNO waiver by an ADC physician that allowed him to be cuffed with side restraints instead of behind the back (Doc. 6 at 4(D), 5(B)).  Plaintiff alleges that Ryan and Freeland—absent any penological justification and with deliberate indifference to Plaintiff's serious medical need—rescinded all SNOs for side restraints, thereby forcing Plaintiff to endure severe pain from cuffing behind the back  (id.).

1            **1.  Legal Standard**

2            To prevail on this claim, Plaintiff must demonstrate that Ryan and Freeland acted with

3    deliberate indifference to his serious medical needs.  Jett v. Penner, 439 F.3d 1091, 1096 (9th

4    Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

5            There are two prongs to the medical deliberate-indifference analysis.  First, a prisoner

6    must show a "serious medical need."  Jett, 439 F.3d at 1096 (citations omitted).  A "'serious'

7    medical need exists if the failure to treat a prisoner's condition could result in further

8    significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith,

9    974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v.

10   Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

11           Second, a prisoner must show that the defendant's response to that need was

12   deliberately indifferent.  Jett, 439 F.3d at 1096.  This second prong is met if the prisoner

13   demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and

14   (2) harm caused by the indifference.  Id.  Prison officials are deliberately indifferent to a

15   prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical

16   treatment.  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

17           **2.  Facts/Arguments**

18           Defendants do not set forth any factual assertions in their DSOF that relate to this

19   claim.  In their motion, Defendants argue that there is no evidence that Ryan or Freeland

20   were the individuals who changed the side-restraint policy or that they were aware of

21   Plaintiff's particular situation; thus, there is no evidence that they knew of and disregarded

22   an excessive risk to Plaintiff's health or safety (Doc. 119 at 22).

23           In response, Plaintiff disputes that Ryan and Freeman were not involved in the policy

24   change or were unaware of the resulting excessive risk (Doc. 125 at 3).  Plaintiff states that

25   he grieved this issue from the Institutional Level all the way to the Central Office, where

26   Ryan or his designee signed off on the response and admitted rescinding the SNOs for side

27   restraints (id.). Plaintiff argues that both these Defendants signed grievances declining to

28   remedy Plaintiff's situation; thus, they both knew of the situation and were on notice of

1    Plaintiff's pain and suffering (id. at 3-4).  Plaintiff submits copies of his grievance documents

2    (id., Attach. 4).

3            Defendants argue in reply that denials of grievances cannot support a § 1983 claim

4    (Doc. 128 at 4).  They argue that they did not personally participate in the decision to stop

5    side-restraints for Plaintiff; rather, they just denied his grievance and appeal, and they noted

6    that the decision "was up to the security staff's judgment, based on a variety of factors

7    including medical issues" (id. at 5).  Defendants maintain that in addition to no evidence of

8    personal participation, there is nothing to show that the policy at issue, which requires

9    security staff to evaluate security implications of medical recommendations for side-

10   restraints, is unconstitutional (id.).  They nonetheless argue Plaintiff's own evidence shows

11   the policy was put into place by Robert Patton, the Security Operations Administrator, who

12   is not a named Defendant (id.).

13                              **3.  Analysis**

14           Defendants make no argument that Plaintiff's severe nerve damage in his hands did

15   not constitute a serious medical need.  See McGuckin, 974 F.2d at 1059-60 (examples of a

16   serious medical need include "[t]he existence of an injury that a reasonable doctor or patient

17   would find important and worthy of comment or treatment; the presence of a medical

18   condition that significantly affects an individual's daily activities; or the existence of chronic

19   and substantial pain").  Thus, the deliberate-indifference analysis turns on whether Ryan and

20   Freeland acted with deliberate indifference to Plaintiff's serious medical need.

21           The relevant documentary evidence includes Plaintiff's December 2, 2008 Inmate

22   Grievance Appeal, which states that despite his medical SNO waiver, he is now being cuffed

23   behind the back pursuant to the rescission order; it is causing him severe pain and discomfort;

24   and it amounts to deliberate indifference to his medical needs (Doc. 125, Attach. 4).

25   Freeland responded to this Appeal on January 27, 2009; he wrote that pursuant to the

26   Security Operations Administrator, all side-restraint SNOs have been rescinded and all

27   inmates will now be restrained according to policy, and if there is a medical issue, Plaintiff

28   should submit a Health Needs Request (id.).

1    Plaintiff appealed this response to the Director and received a response on March 19,

2    2009 (id.).  The response stated that his grievance was reviewed but medical practitioners

3    will no longer issue SNOs for alternative methods of restraint (id.).  The response is signed

4    by "SK[illegible] for Charles L. Ryan, Director," and it notes that a copy was sent to the

5    Browning Unit Deputy Warden (id.).

6    The record also includes a copy of the response to Plaintiff's Medical Grievance

7    Appeal to the Director (id.).  The April 22, 2009 response informs Plaintiff that "there is no

8    longer 'medical' reasons for securing inmates in any particular way.  Health Services staff

9    have been directed by ADC to discontinue the practice of issuing or renewing [SNOs] for

10   using alternative cuffing procedures . . . . Security staff have been directed to use their best

11   judgment in restraining an inmate appropriately" (id.).  The signature on the response is not

12   legible, but it is signed "for Charles L. Ryan, Director" (id.).

13   In support of their claim that their denials of grievances cannot establish liability,

14   Defendants rely on the reasoning in Deadmon v. Grannis (Doc. 128 at 4, citing 2009 WL

15   2151385, at *3 (E.D. Cal. 2009)).  In Deadmon, a prisoner sued the prison's Dietician and

16   Chief Medical Officer, the Inmate Appeals Branch Chief, and the Appeals Examiner for the

17   alleged failure to provide him with a doctor-ordered medical diet in violation of the Eighth

18   Amendment. 2009 WL 2151385, at *1. The plaintiff claimed that the Chief Medical Officer,

19   the Appeals Branch Chief, and the Appeals Examiner violated his Eighth Amendment rights

20   when they denied his grievance appeals.  Id., at *3.  When screening the Complaint, the

21   Court found that the plaintiff stated a claim against the Dietician but he did not allege facts

22   showing that the other three defendants participated in the alleged deprivation, and the

23   plaintiff did not have any substantive right in the processing of appeals.  Id.

24   Defendants contend that just as in Deadmon, Plaintiff's allegations against Ryan and

25   Freeland are insufficient because they fail to establish personal participation in the alleged

26   deprivation (Doc. 128 at 4-5).  The Court finds, however, that Plaintiff's allegations can be

27   distinguished from the allegations at issue in Deadmon.  There, the plaintiff "allege[d] that

28   [the defendants'] denial of his appeal was a violation of the Eighth Amendment."  2009 WL

2151385, at *3. But in the instant action, Plaintiff specifically alleges that Ryan and Freeland were deliberately indifferent to his serious medical condition and the pain that cuffing behind the back caused him (Doc. 6 at 4(D)). Plaintiff does not claim liability based on Defendants' administrative act of denying his appeal; instead, his claim against them is based on "Freeland and Ryan declining to remedy" the ongoing problem despite knowledge of his suffering and the excessive risk of further damage (Doc. 125 at 3). In other words, Plaintiff asserts that they participated in the alleged deprivation, and the Court already determined that these allegations against Ryan and Freeland sufficiently state a claim under § 1983 (see Doc. 7).

The Court further finds that the decision in Deadmon is not controlling, and it conflicts with a number of other cases. Specifically, in Hayes v. Dovey, 2011 WL 1157532, at *6-7 (S.D. Cal. March 28, 2011), the defendants—two deputy wardens—argued that they could not be liable because their only role in the alleged denial of outdoor exercise was the denial of the plaintiff's administrative grievance. The district court found that the defendants did not show that, at the time the plaintiff submitted his grievance, they were powerless to provide relief to the plaintiff. Id. The district court noted that under Ninth Circuit law, the failure to act can form the basis of a § 1983 claim, and the plaintiff had sufficiently alleged that the deputy wardens were aware of the ongoing violation and could have, but failed to, alleviate his suffering. Id. (citing Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988)). Because the plaintiff alleged that the defendants knew about the claimed deprivation and "failed to address the deprivation, either by directly rejecting his [ ] grievance or by personally refusing to alleviate [ ] effects," the district court refused to dismiss the claim. Hayes, 2011 WL 1157532, at *7.

In Flanory v. Bonn, 604 F.3d 249, 256 (6th Cir. 2010), the Sixth Circuit reversed the district court's dismissal of the plaintiff's Eighth Amendment claim against, among other defendants, the warden and other prison officials who denied the plaintiff's grievances complaining that he was without toothpaste. The Court found that the grievance responses demonstrated that the defendants were aware that the plaintiff was without toothpaste due

- 31 -

to the loss of his indigent status and that the only way for him to obtain toothpaste was to purchase it at the inmate store.  Id.  The plaintiff also established resulting harm from the deprivation—a tooth extraction and gum disease that developed as a consequence of not having toothpaste for almost a year.  Id. at 255.  The Court concluded that the plaintiff's allegations that the defendants were deliberately indifferent to his hygiene needs satisfied both the objective and subjective components required for an Eighth Amendment violation. Id. at 256.

Under Hayes and Flanory, whether involvement in the grievance process is sufficient personal involvement to state a constitutional claim appears to depend on factors such as whether, at the time of the grievance response, the violation is ongoing and whether the respondents have authority to act to correct the problem.  A plaintiff must, of course, connect the named defendant to the alleged deprivation, see Rizzo v. Goode, 423 U.S. 362 (1978), but, as noted in Hayes, liability is not limited to affirmative acts.  The causation inquiry focuses on "the duties and responsibilities of each individual defendant whose acts or *omissions* are alleged to have caused a constitutional deprivation."  Leer, 844 F.2d at 633 (emphasis added).

With the foregoing in mind, the Court addresses each individual defendant's liability for deliberate indifference to Plaintiff's serious medical needs.

### a. Ryan

To establish a supervisor's liability, a plaintiff must show facts to indicate that the supervisor defendant either: (1) personally participated in the alleged deprivation of constitutional rights; (2) knew of the violations and failed to act to prevent them; or (3) promulgated or implemented a policy "so deficient that the policy itself 'is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  A supervising official is liable in his individual capacity if there is a sufficient causal connection between his wrongful conduct and the constitutional violation, which can be established if the official "knowingly refus[ed] to terminate a series of acts by others, which

1   [the supervisor] knew or reasonably should have known would cause others to inflict a
2   constitutional injury."  Starr v. Baca, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (internal
3   citations omitted).

4        Defendants assert that there are no allegations that Ryan had knowledge of or any
5   involvement in Plaintiff's situation (Doc. 128 at 4).  The record shows that the "Director's
6   responses" to Plaintiff's Inmate Grievance Appeal and his Medical Grievance Appeal are
7   signed by officials other than Ryan (Doc. 125, Attach. 4).  Plaintiff proffers no other specific
8   facts or evidence to show that Ryan was personally aware of Plaintiff's medical needs and
9   request for side-restraints.  Without any evidence of Ryan's personal knowledge, Plaintiff
10  cannot establish that Ryan was deliberately indifferent.  See Farmer, 511 U.S. at 837.

11       To the extent that Plaintiff sues Ryan for rescinding the SNO policy and implementing
12  a deficient policy that violated his constitutional rights, Defendants submit that the change
13  in policy was put in place by Robert Patton, the Security Operations Administrator (Doc. 128
14  at 5).  Plaintiff presents no specific facts or evidence to connect Ryan to the policy change.
15  Also, the record reflects that inmates are still permitted medical waivers for side-restraints
16  (see Doc. 60, Attach. A, Griffith Decl. ¶ 1 (Browning inmate with SNO for side restraints);
17  Doc. 109, Attach. 4 (March 2011 list of inmates approved for alternative restraints)).  Thus,
18  although the current policy is not entirely clear (see fn. 3), it does not completely bar side-
19  restraints for inmates that require them due to physical limitations—which would raise
20  constitutional concerns.

21       Accordingly, Ryan will be granted summary judgment on the medical-care claim.

22                    **b. Freeland**

23       The evidence shows that Freeland personally authored the response to Plaintiff's
24  Inmate Grievance Appeal (Doc. 125, Attach. 4).  Thus, Freeland reviewed the appeal and was
25  aware that Plaintiff previously had an SNO for side-restraints due to a serious medical need;
26  that he was now being cuffed behind the back; and that he was consequently suffering
27  significant pain and discomfort (id.).  See Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir.
28  2009) (the "primary purpose" of a grievance is "to notify the prison of a problem").  Further,

at the time Freeland responded to the appeal, the alleged violation was ongoing, i.e., Plaintiff was being cuffed behind the back (see Doc. 125, Attach. 4).

Freeland does not present any evidence with the summary judgment motion, such as a sworn statement, showing whether he had the authority to act in response to Plaintiff's complaint.  As noted, the response to Plaintiff's Medical Grievance Appeal states that security staff have discretion to decide how to restrain an each inmate (Doc. 125, Attach. 4). It follows that if regular security officers can decide whether to use side-restraints, Freeland—as the deputy warden—would have authority to direct that side restraints be used on an inmate.  It is Defendants' own evidence, however, that establishes Freeland's power to authorize the use of side restraints.  With their opposition to Plaintiff's Motion for Preliminary Injunction, Defendants submitted evidence that under the new restraint policy initiated in September 2008, the deputy warden makes the final determination of whether to approve an inmate's request for alternative restraints (Doc. 53, Attach., Lewis Decl. ¶ 11).[3] Thus, Deputy Warden Freeland had authority to act to correct the on-going situation.

When construing all facts and inferences in Plaintiff's favor, there is a material factual dispute whether Freeland was aware of Plaintiff's serious medical need and the harm caused by behind-the-back cuffing; whether Freeland had authority to remedy the situation; and whether Freeland disregarded Plaintiff's serious medical need by failing to act.  See Starr, 652 F.3d at 1208 (a supervisor can be liable for his acquiescence in the violation or for conduct showing a "reckless or callous indifference to the rights of others") (citation omitted).  Summary judgment will therefore be denied to Freeland on Plaintiff's medical-care claim in Count II.[4]

Although Defendants moved for summary judgment on all claims and sought

---

[3]In its Order granting a preliminary injunction, the Court noted that the new restraint policy was ambiguous and Defendants did not submit a copy of the policy (Doc. 64 at 13). Nonetheless, their evidence supports that the deputy warden makes the decision whether to allow an inmate to use side-restraints (Doc. 53, Attach., Lewis Decl. ¶ 11).

[4]Defendants expressly state that they do not seek qualified immunity on Plaintiff's claim related to side-restraints (Doc. 128 at 6).

dismissal of the First Amended Complaint "in its entirety" in their motion (Doc. 119 at 25), in their reply, Defendants ask that the First Amended Complaint be "dismissed in its entirety except for the injunctive relief side-restraints claim" (Doc. 128 at 6).  However, Plaintiff sought both injunctive relief and damages (Doc. 6 at 6).  Thus, with summary judgment denied to Freeland on the medical-care claim in Count II, the claims for injunctive relief and damages remain as to this claim.

**IT IS ORDERED:**

(1) The reference to the Magistrate is **withdrawn** as to Plaintiff's Motion for Finding of Contempt (Doc. 105) and Defendants' Motion for Summary Judgment (Doc. 119).

(2) Plaintiff's Motion for Finding of Contempt (Doc. 105) is **granted in part** and **denied in part** as set forth in this Order.

(3) Defendants must comply with the Court's October 15, 2010 Order directing that Defendants and ADC officials use side-cuff restraints when cuffing or restraining Plaintiff during transport or any other time.

(4) Defendants' Motion for Summary Judgment (Doc. 119) is **granted in part** and **denied in part** as follows:

(a) the motion is **granted** as to Count I;

(b) the motion is **granted** as to the conditions-of-confinement claims in Count II;

(c) the motion is **denied** as to the medical-care/side-restraints claim in Count II as to Deputy Warden Freeland.

(5) The Clerk must dismiss Ryan, Smith, Celaya, Patton, Bock, and Kimble as Defendants.

DATED this 31st day of October, 2011.

James A. Teilborg
United States District Judge